# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

---

DANIEL HARRISON,

       Plaintiff,

      vs.                                         1:21-cv-00395 KWR/JFR

WELLPATH, LLC, ENRIQUE BURSZTYN,
RADIOLOGY ASSOCIATES OF ALBUQUERQUE,
THE BOARD OF COUNTY COMMISSIONERS OF
THE COUNTY OF CURRY, PRESBYTERIAN
HEALTHCARE SERVICES, INC., PETER DURSO, *MD*,
JOHN/JANE DOES,

       Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon the following motions relevant to Defendant the Board of County Commissioners of the County of Curry ("Curry County"):

- Defendant The Board of County Commissioners of the County of Curry's Motion for Summary Judgment (Doc. 143);

- Defendant The Board of County Commissioners of the County of Curry's Motion in Limine to Exclude Testimony of Will Adams (Doc. 144); and

- Plaintiff's Motion to Amend or Correct Responses (Doc. 221).

Having reviewed the parties' briefs, the record, and the relevant law, the Court finds that Curry County's Motion for Summary Judgment (Doc. 143) is well taken and therefore is GRANTED IN PART. The federal claims against Defendant Curry County and the John Doe correctional officers are dismissed. The Court declines to exercise supplemental jurisdiction over the state law claims.

This is a medical negligence case arising from alleged misdiagnosis of, or lack of care for, Plaintiff's stroke while he was detained at Curry County Detention Center ("CCDC"). On May 16, 2019, Plaintiff was taken to Plains Regional Medical Center ("PRMC"), a Presbyterian Health Services facility. While at the hospital, Presbyterian or Radiology Associations of Albuquerque, and its employees allegedly failed to identify his stroke. He was instead treated for hypertension and discharged. Once he returned to CCDC from the hospital, he was placed in a holding cell for medical observation by employees of Wellpath, the medical contractor for the detention facility. Plaintiff was monitored by both Wellpath medical staff and Curry County correctional officers.

The claims against Curry County generally stem from his stay in the holding cell, an 18-hour period between his return from the hospital to the following morning at approximately 8:00 a.m. During this time, Plaintiff asserts that the John/Jane Doe correctional officers were deliberately indifferent to a substantial risk of harm, as they *also* failed to identify or seek medical assistance for symptoms of his stroke while he was in a holding cell. Plaintiff also asserts *Monell* claims against Defendant Curry County. As explained below, Plaintiff's federal claims, including the deliberate indifference claims against the correctional officers and the accompanying *Monell* claims against Curry County (Counts I-III) are not well taken and are dismissed.

All claims over which the Court has original jurisdiction have been dismissed. Exercising its discretion, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Therefore, the Court dismisses the remaining state law claims without prejudice to refiling in state court, pursuant to 28 U.S.C. § 1367(c)(3), (d).

**BACKGROUND**

Plaintiff asserts claims against the following groups of defendants: (1) The Board of County Commissioners of the County of Curry ("Curry County"), which operated the detention center where he was detained; (2) Wellpath, LLC, the company contracted to provide 24/7 medical services at the Curry County Detention Center; (3) Presbyterian Health Services, LLC ("Presbyterian), which operated the Plains Regional Medical Center where Plaintiff was taken for emergency medical treatment; (4) and Radiology Associates of Albuquerque and its employees or contractors, related to the alleged negligent interpretation of his CT scan.

On May 16, 2019, while detained pretrial at Curry County Detention Center, Plaintiff was seen by Wellpath nurses for severely elevated blood pressure.  Plaintiff alleged that he had signs of a stroke, including elevated blood pressure, a headache, inability to feel his legs, inability to walk, dizziness, weakness, lethargy, and lack of coordinated movement. Plaintiff was taken to the emergency room, and was treated at a Presbyterian Health Services facility, Plains Regional Medical Center.  Plaintiff alleges that he was evaluated by a Presbyterian doctor, and underwent a CT scan, which was interpreted by a radiologist associated with Radiology Associates of Albuquerque. The radiologist allegedly reported normal findings. Plaintiff alleges that the doctors failed to identify or treat his stroke. Plaintiff was treated for hypertension and discharged back to CCDC. At CCDC, Wellpath nurses placed him in a holding cell for medical observation, but apparently did not contact the on-call medical provider.

Plaintiff asserted the following claims in his First Amended Complaint:

Count I: §1983 Fourteenth Amendment Violation of Due Process – Defendants Curry

County and Employees John/Jane Doe I/II;

Count II: §1983 Violation of Constitutional Rights Failure to provide medical care and

treatment – Defendants the Board of County Commissioners of Curry County

and Employees John/Jane Doe I/II;

Count III: §1983 Violation of Constitutional Rights Failure to Train and Supervise –

Defendants the Board of County Commissioners of Curry County and

Wellpath;

Count IV: Negligence against all Defendants

Count V: Medical Negligence against Wellpath, PHS, PRMC, RAA, Durso, Bursztyn,

Hand, Bradley, and John/Jane Doe

Count VI: Claim for Negligence Hiring, Training and Supervision against Defendant the

Board of County Commissioners of the County of Curry, Wellpath, PHS, and

PRMC.

Count VII: Lost Opportunity for Better Medical Outcome

Count VIII: EMTALA Violation against PHS and PRMC

*See* First Amended Complaint, Doc. 61.

The Court denied Plaintiff's motion for leave to file a Second Amended Complaint.  In relevant part, Plaintiff attempted to amend the complaint to name the John/Jane Doe Defendants, correctional officers at Curry County Detention Center. As explained in that order, the Court denied the motion to amend, reasoning that the amendment was unduly delayed and futile. *See* Memorandum Opinion and Order, Doc. 274.

The claims against Wellpath were dismissed following a stipulated motion for dismissal. *See* Joint Motion to Dismiss Party with Prejudice, Doc. 277.  This dismissal included the claims against the John/Jane Doe Wellpath employees. Doc. 280.

4

# FACTS[1]

## I.     Plaintiff's detention at Curry County Detention Center.

At the relevant times in this case, Defendant was detained at Curry County Detention Center ("CCDC"), which is located in Curry County, New Mexico.

Defendant Wellpath, LLC ("Wellpath") and Curry County had a written contract for Wellpath to provide medical care to detainees at the CCDC. Doc. 143 at 3, Defendant's Statement of Material Facts ("DSMF") ¶1 (undisputed).  Following his arrest on May 2, 2019, Plaintiff was a pre-trial detainee at CCDC until May 17, 2019. Doc. 143 at 3, DSMF ¶ 2.

Plaintiff was arrested on May 2, 2019 and taken to Plains Regional Medical Center ("PRMC") a Presbyterian Health Services facility, for medical clearance.  He was noted to have diabetes mellitus and hypertension.  The treating physician at PRMC noted in Plaintiff's record a belief that he was malingering.  Plaintiff was discharged from the hospital and cleared for incarceration.  Doc. 143 at 3, DSMF ¶ 3.  At intake at the CCDC, during his initial screening by the Wellpath nursing staff, Plaintiff was noted to have high blood pressure. Plaintiff was provided medication, but he did not respond to the medication delivered. A Wellpath nurse contacted the Wellpath provider and Plaintiff was sent back to PRMC for evaluation.  Doc. 143 at 3, DSMF ¶ 3.

---

[1]      The following facts are largely admitted, or otherwise not *genuinely* disputed by pinpoint citations to the record.  Disputes concerning the facts are noted where relevant.  The Court has considered all of the parties' asserted material facts in the motion (doc. 143), response (doc. 217), and reply (Doc. 234).  As acknowledged by Plaintiff, many of his asserted facts are not relevant to the issues in Curry County's Motion for Summary Judgment and therefore not recounted herein. *See* doc. 240 at 1-2.

Defendant's asserted material facts were misnumbered. Rather than renumber Defendant's facts to correct them, the Court refers by page number and the misnumbered facts.

The Court does not consider the facts and evidence presented in, or in response to, motions for summary judgment presented by *other* defendants, and which were not presented in the briefing on Curry County's summary judgment motion (Doc. 143).  Plaintiff did not expressly incorporate by reference facts from other motions in his assertion of material facts. *See* doc. 217 at 11.  Considering facts outside the relevant motion is not contemplated under Fed. R. Civ. P. 56 or Local Rule 56.1.  Moreover, doing so would prejudice Defendant Curry County. Curry County did not have the opportunity to address asserted facts or evidence asserted outside of this motion. Moreover, the defendants do not necessarily adequately represent each other's interests, as they appear to assert that the other defendants are to blame.

Medical staff is present onsite at CCDC, 24 hours per day.  *Id.* at ¶ 4.  Two onsite nurses are on staff during the day shift and one nurse is on duty during the night shift.  *Id.* at ¶ 5.  A medical provider is on site twice per week and on call otherwise.  *Id.*  Plaintiff had daily encounters with medical staff, including through administration of medications for high blood pressure and diabetes.  The nurses recorded that Plaintiff frequently refused medications.  At one point, Plaintiff was placed on a special diet due to refusing medication.  Doc. 143 at 4, ¶ 6.[2]

Although Plaintiff had been sent to Plains Regional Medical Center four times during his stay at CCDC from May 2 to May 17, 2019 to be seen by a medical provider, he had not yet been seen for his "initial health assessment" by a Wellpath doctor.  Doc. 217 at 12, Plaintiff's Statement of Material Facts ("PSMF") at ¶¶ 5-7.  Plaintiff asserts that based on his diabetes and high blood pressure, he should have been placed in the chronic clinic.  Doc. 217 at 12-13, PSMF ¶¶ 7-9.

## II.     Plaintiff's medical emergency and transportation to a Presbyterian hospital.

On May 16, 2019, CCDC staff called for a "Code Blue."  Plaintiff was found with an elevated blood pressure of 210/127.  He complained of headache and when asked by Wellpath nurses, an inability to feel his legs. It was noted by Wellpath staff that Plaintiff was unable to stand on his own.  Doc. 143 at 4 ¶ 7.  Wellpath nurse Jeff Conners contacted a medical provider, NP Johan Martin, for an order for Clonidine to address Plaintiff's high blood pressure.  Eventually, Mr. Conners contacted CNP Martin for orders to send Plaintiff to the emergency room.  Doc. 143 at 4, ¶8.

[2] Although Plaintiff nominally disputes this fact, he does not genuinely dispute this fact by citation to the record which creates a genuine dispute of material fact.  *See* Doc. 217 at 3. Defendant's asserted fact was supported by the record.

Nurse Conners filled out an emergency room referral request form listing Plaintiff's chief complaint as high blood pressure and lethargy. This form goes with an inmate to the emergency room.  Doc. 143 at 4, DSMF ¶ 9.

Plaintiff presented to the emergency department at PRMC at 8:53 am where he was triaged by nurse Keisha Bradley.  Doc. 143 at 4, ¶ 10.  Nurse Bradley assessed Plaintiff with a fall risk of 6 attributed to mobility deficit and weakness.  She also noted that Plaintiff ambulated independently.  *Id.* at ¶ 11.

Plaintiff was evaluated by Dr. Peter Durso, who noted that the reasons for Plaintiff's visit were hypertension and headache. Doc. 143 at 5, DSMF ¶ 12. A non-contrast CT scan was ordered by Dr. Durso and performed at PRMC on May 16, 2019.  Despite areas of hypodensity in the left cerebellar hemisphere, consistent with an ischemic stroke, the report was returned with normal findings.  Doc. 143 at 5, DSMF ¶13.

Dr. Enrique Bursztyn was the radiologist who read the CT scan on May 16, 2019.  He had reported normal findings. According to Dr. Enrique Burztyn, after reviewing the May 16, 2019 CT in retrospect, he would have noted the spots in the report. Dr. Bursztyn stated he should have called "something on the left" and that in retrospect, he may have been mistaken.  Doc. 143 at 5, ¶14.

According to Plaintiff's allegations, Dr. Durso failed to evaluate or treat Plaintiff for stroke.  Doc. 143 at 5, ¶ 15.  At PRMC, on May 16, 2019, Plaintiff was treated for hypertension and discharged back to the detention center. Doc. 143 at 5, ¶ 16. According to PRMC's neurologist, Dr. Chitra Venkatasubramanian, when Plaintiff first presented to the emergency room at PRMC on May 16, 2019, the radiology studies showed the existence of a stroke in the left cerebellum based on her review of the radiology images.  Doc. 143 at 5, DSMF ¶ 17.

According to Plaintiff's expert emergency room physician, Dr. Seth Womack, the stroke was present before May 16, 2019, and was present on the CT scans read by Dr. Bursztyn on May 16, 2019.  Doc. 143 at 5, DSMF ¶ 18.

According to Plaintiff's expert emergency room physician Dr. Seth Womack, Dr. Durso should have admitted Plaintiff on May 16, 2019 and the detention center would not have the ability to provide the necessary level of care for Plaintiff. Doc. 143 at 6, DSMF ¶ 19. Plaintiff admits that he should not have been discharged back to the detention center. Doc. 143 at 6, DSMF ¶ 20.

## III.    <u>Plaintiff returns to the Curry County Detention Center with the undiagnosed stroke.</u>

Later on May 16, 2019, Plaintiff was returned to the Curry County Detention Center. Upon his return, Wellpath nurse Conners evaluated Plaintiff at admission and found that Plaintiff stated he was "woozy from meds", unable to stand and had slightly slurred speech. Nurse Conners also noted his "LOS as times three and equal grip with no deficits to motor sensory." Doc. 143 at 6, DSMF ¶ 20. Nurse Conners placed plaintiff on a medical hold for safety and observation.  *Id.*

When an inmate returns from offsite care, they are evaluated by Wellpath medical staff. Doc. 143 at 6.  Upon being evaluated, if Nurse Conners had a concern, he was supposed to reach back out to the on-call medical provider.  Doc. 143 at 6, DSMF ¶ 24.  Before sending Plaintiff to the emergency room in the morning on May 16, 2019, Nurse Conners contacted the medical provider.  When Plaintiff returned form the emergency room on May 16, 2019, no note indicates that Nurse Conners contacted the medical provider.  Doc. 143 at 6, DSMF ¶ 23; doc. 217 at 16, PSMF ¶ 32. After Plaintiff's return on May 16, 2019 from the emergency room, he was

evaluated by medical staff in a separate room where detention officers are not present.  Doc. 143 at 6, ¶ 24.  The detention officer who transported Plaintiff back on May 16, Mr. Dawson, does not recall Nurse Conners stating anything about returning Plaintiff to the emergency room. Doc. 143 at 6, DSMF ¶ 25.  The decision to return an inmate to the emergency room would have been made by the medical contractor and the medical administrator.  Doc. 143 at 7, DSMF ¶ 26.  As explained below, Plaintiff has not genuinely disputed these facts.  The record is insufficient to establish that an unnamed correctional officer influenced Nurse Conner's decision, or prevented Nurse Conners from contacting a medical provider or returning Plaintiff to the emergency room.

Plaintiff disputes these facts, but not genuinely. Plaintiff asserts that he was not medically evaluated, as in deposition testimony, Wellpath Nurse Conners speculated that someone may have told him that it was pointless to send him back to the emergency room.  Doc. 217, Exhibit 7 at 66:1-16. Plaintiff speculates that somoene may have suggested that Nurse Conners not send Plaintiff back to the emergency room, as PRMC would just send him back.  But Nurse Conners was unsure what was said and was unsure who said it.  He stated it may have been said another Wellpath nurse, or may have been a correctional officer, but he was unsure who said it. *See* Doc. 217, Exhibit 7 at 66:11-16 (noting it could have been a correctional officer or Wellpath nurse). the Court finds this testimony is speculative. Therefore, this testimony is insufficient to establish that any Curry County employee interfered with Nurse Conners' medical evaluation of Plaintiff or was responsible for Nurse Conner's decision not to contact a medical provider as provided in the policies and procedures. Nor does the record establish that a Curry County or Wellpath employee directed Nurse Conner not to follow Wellpath procedures. *See* Doc. 217, Exhibit 7 at 66:11-16 (noting it could have been a correctional officer or Wellpath nurse).

After he returned to the CCDC on May 16, 2019, Plaintiff was put on medical observation in a holding cell, in accordance with Nurse Conner's request.  Doc. 143 at 7, DSMF ¶ 24.[3]  While in the medical observation, Plaintiff was in a holding cell, with a window, in a part of the detention center that is staffed with a posted correctional officer. Security staff performs security observation every thirty minutes. In addition, Wellpath reviews and evaluates Plaintiff periodically. Plaintiff and Defendant Curry County agree that, according to Wellpath's medical provider, medical (Wellpath) was to check on Plaintiff hourly.  Doc. 143 at 7, DSMF ¶ 25; Doc. 217 at 17, PSMF ¶ 40.[4]

After being placed in medical observation in holding, until 8:38 a.m. on May 17, 2019, Plaintiff was observed during security checks every 30 minutes and was seen by medical staff at least four times before 8:00 a.m.  Doc. 143 at 7, DSMF ¶ 26; Doc. 217 at 17, PSMF ¶ 42 (noting log indicated a nurse checked on Plaintiff at 18:14, 1:37, 2:16, and 3:30).[5]  At various times, Plaintiff was observed laying on his right side, laying on his back, laying on his stomach, sitting on his bunk or bench, receiving dinner, and standing at the door.  Doc. 143 at 7, DSMF ¶ 27.

At 8:00 a.m. on May 17, Plaintiff was again seen by Wellpath medical staff, but he refused medications at that time.  Doc. 143 at 7, DSMF ¶ 28; Doc. 217 at 17, PSMF ¶ 43.  At 8:34 a.m., Plaintiff was found in his observation cell unresponsive.  Emergency services were

---

[3] Plaintiff attempts to assert that Sgt. Dawson ordered he be placed in medical observation.  Doc. 217 at 16, PSMF ¶¶ 34, 35.  There is no citation to the record to support this assertion, and the assertion may therefore be disregarded by the Court.  Fed. R. Civ. P 56(c)(3), (e).  Moreover, the record suggests that Nurse Conners placed Plaintiff in medical observation. Sgt. Dawson explained that Nurse Conners ordered that Plaintiff be placed in medical observation.  In deposition testimony, Joe Alaniz agreed with Plaintiff's counsel that the custody placement was initiated at Wellpath's request, and the observation log form was signed by Sgt. Dawson. Doc. 143, Deposition of Joe Alaniz, Exhibit 6 at 182:2-12.
[4] Plaintiff does not genuinely dispute that medical checks were supposed to occur hourly, but merely asserts that medical checks were in fact not conducted hourly.
[5] Plaintiff asserts there is no record that Wellpath staff saw Mr. Harrison while he was in the holding cell.  Doc. 217 at 17, ¶ 44. This is contradicted by his own admission that Wellpath staff were logged to have seen him four times before 8:00 a.m. on May 17, 2019.

called and Plaintiff was transported to Plains Regional Medical Center.  Doc. 143 at 7, DSMF ¶ 29.

At PRMC, Plaintiff was found to have developed a large area of infarction in the left cerebellar hemisphere and a small area of infarction in the superior aspect of the left cerebellar hemisphere Also present in the CT were two more infarctions to Mr. Harrison's right and left thalamus. Doc. 143 at 8, DSMF ¶ 30.

Plaintiff has no evidence that the detention center security staff was inadequately trained. Doc. 143 at 8, DSMF ¶ 31, citing Doc. 143, Exhibit J (Plaintiff's expert Will Adams agreeing that he does not have evidence of inadequate training).[6] Plaintiff does not dispute that at all material times, the detention center was sufficiently staffed.  Doc. 143 at 8, DSMF ¶ 32 (undisputed).

The Agreement for Inmate Health Services Contract between Defendant Curry County and Defendant Wellpath provided for the delivery of health care services for inmates consistent with standards set by the National Commission on Correctional Healthcare, the American Correctional Association and the Children Youth and Families Department. Doc. 143 at 8, DSMF ¶ 33.  The Wellpath Contract provided for twenty-four hour per day staffing coverage in accordance with a staffing matrix, which included nursing and an on-site or on-call medical provider. Doc. 143 at 8, DSMF ¶ 34.  The Wellpath Contract provided for a medical screening within two hours after booking, intended to identify potential emergency situation and to ensure that patients with known illnesses and currently taking medications are identified for further assessment and continued treatment.  Doc. 143 at 8, DSMF ¶ 35.  The Wellpath contract also

---

[6] Plaintiff's sole dispute is that Curry County's correctional staff were inadequately trained on identifying medical emergencies.  This is not a genuine dispute, as Plaintiff does not present evidence that officer's training on identifying emergencies was inadequate.  Plaintiff cites to an Affidavit by his expert witness, Will Adams, but his expert witness's affidavit does not state that this training was inadequate in a correctional setting.  *See* Affidavit of Will Adams, Doc. 217 at 83-85, Exhibit 9

provided for a health assessment which was to be performed as soon as possible, but not later than fourteen (14) days after arrival.  Doc. 143 at 8, DSMF ¶ 36.  The contract provides for scheduled sick calls by a qualified health care professional in a clinical setting three times per week. doc. 143 at 8, DSMF ¶ 37.  If emergency care is required, detainees are sent to Plains Regional Medical Center, where the county has negotiated rates for service. Doc. 143 at 8, DSMF ¶ 38.  The contract provided for Wellpath to have detention health care policies and procedures, which were in place at the time of Plaintiff's detention. Doc. 143 at 9, ¶ 39.  The policy related to Continuity, Coordination and Quality of Care during Incarceration requires that upon return from emergency services, (a) patients are seen by a qualified health care professional health care liaison; (b) recommendations for specialty consultations are reviewed for appropriateness of use in the correctional setting; (c) a provider is contacted in a timely manner to ensure proper implantation of any order and to arrange appropriate follow-up; (d) if changes in treatment recommendations are clinically indicated justification for the alternative treatment plan is documented and shared with the patient; (e) when a patient is returned from an emergency room visits, the patient is brought to the clinic before returning to the housing unit for review of discharge orders and follow-up; (f) when a patient returns from hospitalization, the discharge is coordinated with on-site health care staff, and discharge instructions are reviewed.  Appropriate orders are written for housing and follow-up treatment. These policies and procedures apply to Wellpath health care staff. Doc. 143 at 9-10, DSMF ¶ 42.

The policies and procedures at CCDC were consistent with the standard of care and based on the format of national standards, including the National Commission on Correctional Healthcare, as well as the American Correctional Association.  Doc. 143 at 10, ¶ 43.

Plaintiff asserts that had he been placed in restrictive housing, he would have been more consistently observed by the same officer.   Doc. 217 at 20, ¶ 59. The Court disregards this asserted fact, as he does not cite to the record in support of this assertion, and it is speculative. *Id.;* Fed. R. Civ. P. 56(c)(3), (e).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996).  To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed."  *Branson v. Price River Coal Co*., 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).

When making this determination, the Court keeps two principles in mind. First, while the Court must draw all "reasonable inferences … in the light most favorable to the non-moving party*,"* *id*. at 1261, that party's "version of the facts must find support in the record," *Thomson v. Salt Lake*

*Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Second, the Court's role is not to weigh the evidence or decide any issues of credibility, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249, 255.

## DISCUSSION

I.   **Plaintiff has not shown that any individual Curry County correctional officer was deliberately indifferent to a substantial risk of harm to Plaintiff (Count I).**

Under Count I, Plaintiff appears to assert deliberate indifference claims against individual Curry County correctional officers.  *See* Response, Doc. 217 at 21 (clarifying that Count I is solely against individual John Doe defendants). Although no individual Curry County officer has been named in this case, the parties addressed whether Count I should be dismissed, and whether an individual Curry County officer committed a constitutional violation.  *See, e.g.,* Doc. 217 at 22 (As to Count I and II, Plaintiff argued that individual officers were deliberately indifferent to a substantial risk of harm to Plaintiff).  Therefore, the Court will address Count I as well.

Defendant Curry County asserts that Count I should be dismissed against the John Doe correctional officers, as Plaintiff has not named the individual Curry County correctional officer. Plaintiff had filed a motion for leave to amend his complaint to in part name those officers.  As explained in a prior opinion, the Court denied the motion for leave to amend, reasoning that (1) the amendment was unduly delayed and lacked good cause for the delay, it was (2) futile as Plaintiff had not plausibly pled a deliberate indifference claim, and alternatively, (3) Plaintiff had not plausibly alleged that the *individual* officers were personally liable, i.e., that they were personally deliberately indifferent to a substantial risk of harm to Plaintiff. Rather, Plaintiff pled the allegations against multiple officers together without stating what each officer did.  The Court reasoned this group pleading was insufficient under § 1983, which requires that a plaintiff plead how each individual officer violated his constitutional rights. *See* Memorandum Opinion

14

and Order, Doc. 274.   Because the Court denied leave to amend to add the individual correctional officers as named defendants in this case, there are no pending claims against the individual correctional officers. *See, e.g., Bell v. City of Topeka, KS*, 279 F. App'x 689, 691 (10th Cir. 2008) (affirming decision where district court denied amendment to name and identify john doe defendant, entered summary judgment in favor of sole named defendant, and therefore dismissing action in its entirety). Alternatively, for the reasons the Court explained in its prior opinion denying the motion to amend, the federal claim (Count I) against the individual john doe correctional officers is dismissed. *See* Memorandum Opinion and Order, Doc. 274.

Alternatively, the parties have briefed whether the John Doe correctional officers committed a constitutional violation, i.e., whether they were deliberately indifferent to a substantial risk of harm to Plaintiff.  *See* Doc. 217 at 22.  As explained below under Count II, Plaintiff has not demonstrated that any individual Curry County correctional officer was deliberately indifferent to a substantial risk of harm to Plaintiff.  For this alternate reason, Count I may be dismissed against the John Doe correctional officers.

Therefore, claims under Count I do not exist as to any individual correctional officer. Alternatively, to the extent they do, Count I is dismissed as to the individual John/Jane Doe correctional officers.

## II.   Plaintiff's *Monell* claim (Count II) against Curry County is dismissed.

Under Count II, Plaintiff appears to assert that Defendant Curry County is liable under *Monell* stemming from the deliberate indifference of one of its officers.  To the extent Plaintiff asserts a *Monell* claim stemming from the unconstitutional acts of individual Curry County correctional officers, the Court finds that Plaintiff has not created a genuine dispute of material

fact that an individual officer was deliberately indifferent to a substantial risk of harm to Plaintiff.

Alternatively, even assuming a correctional officer were deliberately indifferent to a substantial risk of harm, Plaintiff has not created a genuine dispute of material fact that such deliberate indifference stemmed from an unconstitutional custom of Curry County.

Finally, even if Plaintiff alleges a *Monell* violation independent from the deliberate indifference of any individual officer, Plaintiff has not demonstrated that Defendant Curry County operated a custom or policy resulting in a deliberate indifference to a substantial risk of harm to Plaintiff.

Therefore, Count II is dismissed as to Defendant Curry County.

**A.      Plaintiff has not demonstrated that an individual officer was deliberately indifferent to a substantial risk of harm, meriting dismissal of Count I and Count II.**

Defendant Curry County asserted that the *Monell* claim fails because Plaintiff has failed to show any individual correctional officers committed a constitutional violation. The Court agrees. To the extent the *Monell* claim against Curry County is based on the alleged unconstitutional acts of an individual correctional officer, that claim fails because Plaintiff has failed to demonstrate that an individual Curry County officer was deliberately indifferent to a substantial risk of harm to Plaintiff.

The Court notes the limited scope of Plaintiff's argument regarding the deliberate indifference of individual defendants. Plaintiff acknowledged that Wellpath and Curry County attempted to shift the blame for the constitutional violations to each other in their separate motions.  Doc. 217 at 2.  Plaintiff does not appear to assert that Curry County should be liable for

the deliberate indifference of Wellpath employees.  *See* Doc. 217 at 24, 26.  Plaintiff does not argue, cite to authority or the record, or provide any reason why Curry County should be held liable for the alleged constitutional violations committed by Wellpath or Wellpath employees. Therefore, like the parties, the Court assumes for the purpose of this motion that Curry County is not liable for the constitutional violations of Wellpath employees. *See, e.g., Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1275 n.20 (10th Cir. 2022) (declining to consider theory of *Monell* liability which was not presented to district court).

Plaintiff here was a pretrial detainee, and his deliberate indifference claim arises under the Fourteenth Amendment, which applies the same test as under the Eighth Amendment. *Strain v. Regalado*, 977 F.3d 984, 993 (10th Cir. 2020) ("The constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause."). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see Estelle v. Gamble*, 429 U.S. 97, 105 (1976) ("[D]eliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.").  "The deliberate indifference standard has objective and subjective components." *Burke*, 935 F.3d. at 992 (brackets and quotations omitted).  The objective component does not appear to be in dispute in this case, therefore the Court turns to the subjective component.

To satisfy the subjective component, the plaintiff must show the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Burke*, 935 F.3d at 992 (quoting *Farmer*, 511 U.S. at 837). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quotations omitted). "Whether a prison official had the requisite knowledge of a

substantial risk is a question of fact." *Id.* (quotations omitted). "We have found deliberate indifference when jail officials confronted with serious symptoms took no action to treat them." *Id.* at 993.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Mata v. Saiz,* 427 F.3d 745, 752 (10th Cir.2005) (citation omitted), *quoted in Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1263 (10th Cir. 2022). "This is so because if a risk is obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." *Id.* (brackets and internal quotation marks omitted). But this exception requires that such risks present themselves as obvious to the so-called "reasonable man." *See Mata*, 427 F.3d at 752 (citing *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

"A prison medical professional who serves 'solely ... as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if he or she 'delays or refuses to fulfill that gatekeeper role.' " *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir.2005) (quoting *Sealock*, 218 F.3d at 1211). However, "the subjective component presents a high evidentiary hurdle to the plaintiffs: a prison official must know about and disregard a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

At issue here is Plaintiff's placement in a holding cell for approximately 18 hours under medical observation. Plaintiff was returned from Plains Regional Medical Center on May 16, 2019, evaluated by Wellpath medical staff, and placed in a holding cell at approximately 2:15

p.m. until an emergency was called on May 17, 2019 at 8:34 a.m. Doc. 217 at 17, PSMF ¶ 38. As explained below, Plaintiff was observed by both Curry County correctional officers and Wellpath medical staff.

"Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Brown*, 662 F.3d at 1163 (internal quotations omitted). Here, Plaintiff has not created a genuine dispute of material fact that any particular individual officer was aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and drew that inference. Plaintiff does not assert what each individual officer is alleged to have known and disregarded to establish deliberate indifference. *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) (Where there are multiple defendants, "a plaintiff must show that each defendant acted with the requisite state of mind."), *citing Dodds,* 614 F.3d at 1200 (noting that *Iqbal* and § 1983 require plaintiffs to prove that "each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation").  Under § 1983, an individual officer may only be liable for their own individual actions, and not the actions of others. *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013); *Mayfield v. Presbyterian Hosp. Admin.,* 772 F. App'x 680, 686 (10th Cir. 2019) ("And an officer would not know, on the basis of Mayfield's generalized allegations, what wrongdoing he or she is alleged to have committed."). Where multiple defendants are involved, "it is particularly important" that plaintiff "make clear exactly *who* is alleged to have done *what* to *whom,* ... as distinguished from collective allegations." *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013). Plaintiff does not address what any particular employee was aware of, or that any particular individual was deliberately indifferent, but instead groups the employees together. *See* Response, Doc. 217 at 24.  This is insufficient to establish liability under a § 1983 claim.

Plaintiff cites to his asserted facts 11, 13, 15, 16, 17, 37, 41, 42, 45, and 47 for evidence that individual correctional officers were deliberately indifferent to a substantial risk of harm. *See* Doc. 217 at 24, 26. None of these facts demonstrate what symptoms any particular individual correctional officer saw, much less that an individual officer observed a substantial risk of harm and was deliberately indifferent to that risk of harm. In these facts, Plaintiff largely points to Wellpath's or Presbyterian's medical records, but does not cite to any evidence that the individual officers would have been aware of those medical records or the symptoms addressed in those records.

To the extent Plaintiff asserts that any substantial risk of harm as reflected in the symptoms listed in his medical records should have been obvious to a "reasonable man" who observed him in his cell, the Court disagrees as this alleged substantial risk of harm did not appear to be obvious to either Wellpath medical professionals or Presbyterian medical professionals at Plains Regional Medical Center (who diagnosed him with hypertension).

Plaintiff cites to his asserted fact 11 and 13. These facts are irrelevant, as they merely state that the lapel footage showed Plaintiff experiencing a medical emergency at approximately 12:30 p.m. on May 16, 2019, and Wellpath employees, nurses Sarah Shaw and Jeff Connors, responded to the emergency. *See* Doc. 217 at 13. This was before Plaintiff was taken to the hospital, and does not establish what any particular correctional officer knew or observed while he was in holding after returning from the hospital. This fact does not establish what symptoms occurred, or what any of the individual officers who observed Plaintiff in holding after his return from the hospital observed.

Similarly, Plaintiff cites to his asserted fact #15. That fact states that Wellpath's progress notes indicates that on May 16, Plaintiff was seen for elevated blood pressure and was unable to

stand without the assistance of three people.  He was then lifted on to a stretcher and transported by EMS. Plaintiff has not cited to anything in the record that any particular correctional officer knew, or had access, to Plaintiff's medical records. *See* Doc. 217 at 24. Plaintiff does not state which officers observed this emergency, and whether they were responsible for him while he was in the holding cell. Plaintiff does not argue in his response how any of the correctional officers would have been aware of these symptoms.

Plaintiff also cites to his facts 16 and 17, which are summaries of his symptoms in his medical records, which included high blood pressure, mild headache, dizziness, unsteadiness, and generalized weakness. *See* Doc. 217 at 13-14.  None of these facts demonstrate that any of the officers who observed Plaintiff while he was in the holding cell at the relevant time were aware of these symptoms. Rather, officers were generally not privy to a detainee's medical records.

Similarly, Plaintiff cites to his asserted fact 37, which recites Wellpath's progress notes following his return from the emergency room. Wellpath nurse Jeff Connors stated in the note that Plaintiff was treated at the emergency room for hypertension.  Plaintiff stated he was woozy from his medications and could not stand on his own. He had slurred speech.  Doc. 217 at 16, ¶ 37. Again, nothing in the record suggests that any correctional officers were privy to this note in his file.  Moreover, nothing in Plaintiff's asserted fact 37 states that any of the officers observing Plaintiff in his holding cell were aware of these facts.

Plaintiff cites to his asserted fact #41 for the proposition that "correctional staff conducts medical observation in the holding cells, but the correctional staff does not have any information as to what they are observing." Doc. 217 at 17, ¶ 41. This fact appears to be irrelevant to showing that any correctional officers were aware of and deliberately indifferent to a substantial

risk of harm to Plaintiff.  Rather, it appears to admit that correctional officers were not given access to his medical records. Even assuming this asserted fact were relevant, Plaintiff's citation to the record does not support his assertion that correctional officers conduct medical observations or checks of detainees.

The parties appear to be disagree on the meaning of the phrase "medical observation" used in deposition testimony. Both medical staff (nurses) and correctional officers were expected to check on those in holding cells, but they perform different functions. Doc. 143-9 at 9, Deposition of Sgt. Dawson, Exhibit I at 46:15-22. Joe Alaniz stated that correctional officers do not conduct medical observations. Doc. 217 at 66, Exhibit 6 at 132:4-6. When shown a directive, Joe Alaniz stated that according to the directive, correctional officers conducted observations while a detainee was placed in holding for medical observations. But Plaintiff does not cite to the directive for the Court to review. *See* Doc. 217 at 24, 26. Correctional officers were not in place to manage his medical issues.  Doc. 217 at 68, Exhibit 6 at 182:11-12.  Reviewing Joe Alaniz's deposition testimony as cited, it is clear that Wellpath medical staff were expected to conduct medical observations. Doc. 217 at 66, Exhibit 6 at 132:4-6.

Moreover, the affidavit of Joe Alaniz stated that "[m]edical observation in this setting is conducted by health care staff. The observation log reveals that medical staff came to Mr. Harrison's holding cell three different times on May 16-17, 2019 before 8:00 a.m. on May 17. At 8:00 a.m. records reveal that a Wellpath nurse came to see Plaintiff, but the visit was documented as a refusal. The detention officers conduct visual security checks to monitor the detainees' welfare and alert medical if someone is in distress or in need of medical contact." Affidavit of Joe Alaniz, Doc. 143-1, Exhibit A at 4-5.

Wellpath's medical provider stated that she expected medical staff to check on those in holding cells under medical observation hourly. Doc. 143-2, Deposition of Michelle Paquin, NP, Exhibit B at 26:17-24. Therefore, the record does not reflect that correctional officers were expected to perform any kind of specialized medical care while a detainee was in a holding cell under medical observation.

Even assuming correctional officers were to conduct medical observations alongside Wellpath medical staff, the record does not reflect they were expected to provide any specialized medical care, especially when Wellpath medical staff was also expected to conduct checks on Plaintiff.

Plaintiff also cites to his asserted facts 42, 45, and 47. In those facts, Plaintiff asserted that correctional staff logged entries of his movements. Plaintiff was observed by correctional officers, as demonstrated by the observation log. Plaintiff was also observed by a Wellpath nurse at 18:14 on May 16, and 1:37, 2:16, 3:30, 8:00, and 8:38 on May 17. *Se* Doc. 217 at 17, PSMF ¶¶ 42, 44. Plaintiff asserts that the log demonstrates he was observed to be stationary in his wheelchair for nine hours until he was found unresponsive in the morning at approximately 8:30 a.m.. Plaintiff has not demonstrated that, after observing Plaintiff being stationary at nighttime during these hours, it would have been obvious to a reasonable person that Plaintiff was suffering a stroke or there was a substantial risk of harm. *see, e.g., Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1264 (10th Cir. 2022) (it was not obvious to deputy that plaintiff was having a seizure while laying down under a blanket).

Even assuming that officers were aware of the symptoms in his medical file (which is not in the record), those medical files document that Plaintiff had been seen by multiple sets of medical professionals. Plaintiff was seen, diagnosed, and treated by medical professionals at

Plains Regional Medical Center prior to his 18-hour stay in the holding cell. "Prison officials generally may rely on the advice and course of treatment prescribed by medical personnel." *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1265 (10th Cir. 2022). Tenth Circuit "precedent is clear that "a misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim." *Self*, 439 F.3d at 1234. Here, Plaintiff has not argued or demonstrated that the course of treatment, diagnosis, or medical advice was so unreasonable that the individual correctional officers should have disregarded it and not relied upon the medical decisions made by doctors at PRMC or the Wellpath nurses.

In sum, Plaintiff has not shown that any of the officers who observed Plaintiff while he was in the holding cell following his return from the emergency room were aware of any stroke symptoms, or a substantial risk of serious harm. Plaintiff merely cites to his medical records, without showing that an officer would have been aware of the symptoms in the medical records. Rather, Plaintiff admits that the correctional officers are not informed of a detainee's medical issues. Doc. 217 at 17, ¶ 41. The record reflects that correctional officers did not have access to medical information. *See* Doc. 234 at 4 ¶ 46, *citing* Doc. 217 at 68, Deposition of Joe Alaniz, at 182:8 to 184:2. Plaintiff has not pointed to any evidence that any particular officer believed Plaintiff was suffering a stroke otherwise drew the inference that Plaintiff faced a substantial risk of harm to his health or safety. *Estate of Beauford*, 35 F.4th at 1264. Therefore, Plaintiff's claims of deliberate indifference against individual officers under Count I are dismissed. Moreover, to the extent the *Monell* claims under Count II are based on an individual correctional officer's deliberate indifference to a substantial risk of harm to Plaintiff, Count II is also dismissed.

**B.      To the extent Plaintiff had demonstrated a constitutional violation by an individual Curry County correctional officer, Plaintiff has not demonstrated such constitutional violation was the product of a custom of Curry County to support a *Monell* violation.**

Even assuming Plaintiff had established a constitutional violation by an individual defendant, Plaintiff has not established municipal liability as to Defendant Curry County. Plaintiff identified two alleged unconstitutional customs: (1) deviations *in this case* from Wellpath's policies regarding the treatment of Plaintiff and (2) the practice of having both correctional officers and medical staff check on Plaintiff. As explained below, Plaintiff has not established that either of these were an unconstitutional custom.

"[A] municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations omitted). "Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Id.* (quotations omitted), *quoted in Mayfield v. Presbyterian Hosp. Admin.*, 772 Fed. Appx. 680, 685–86 (10th Cir. 2019) (unpublished).

Plaintiff must show that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to

25

adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

"A municipality is liable only when the official policy [or custom] is the moving force behind the injury alleged." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). "A plaintiff must therefore 'identify a government's policy or custom' that caused the injury.' " *Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th Cir. 2013) (unpublished) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)). "The plaintiff must then show 'that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.' " *Id.* (quoting *Schneider*, 717 F.3d at 769).

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. "[C]ontinued adherence to an approach that [the decision makers] know or should know has failed to prevent tortious conduct by employees may establish ... conscious disregard." *Bd. Of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

Initially, Plaintiff focuses on the actions of Wellpath employees in Plaintiff's case.  As explained above, Plaintiff does not argue that Curry County is liable for the actions of Wellpath employees. He does not explain why Curry County would be liable under *Monell* for the actions of Wellpath employees, or cite to any authority or the record explaining why.

Even assuming Plaintiff had demonstrated Curry County could be liable under *Monell* for the actions of Wellpath employees, Plaintiff has not cited to anything in the record demonstrating that there was a custom and Curry County was deliberately indifferent to a substantial risk of harm by that custom. Rather, as explained below, the evidence he cites in his analysis is

26

generally limited to instances, solely in this case, where Wellpath employees failed to follow Wellpath policies.  Plaintiff has therefore not demonstrated that a custom existed.

Plaintiff admitted that Curry County and Wellpath's policies met national standards. However, Plaintiff asserts that Curry County is liable because Wellpath employees "grossly deviated" from these policies in their treatment of Plaintiff. "A 'custom' has come to mean an act that, although not formally approved by an appropriate decisionmaker, has such widespread practice as to have the force of law." *Carney v. City & Cnty of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).  "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quotations omitted).

Plaintiff fails to demonstrate an "informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," *Bryson*, 627 F.3d at 788. Plaintiff points to Wellpath employees failing to follow Wellpath's policies in this case. "The Supreme Court has held that simply failing to follow jail policies is not a constitutional violation in and of itself." *Ernst v. Creek Cnty. Pub. Facilities Auth.*, 697 F. App'x 931, 934 (10th Cir. 2017), *citing Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *George, on behalf of Bradshaw v. Beaver Cnty.,* 32 F.4th 1246, 1254 (10th Cir. 2022) (failure to follow five policies in treatment of plaintiff did not constitute a *Monell* violation).  Even assuming otherwise, Plaintiff does not attempt to demonstrate that the failure to follow Wellpath's polices in this case was a widespread practice, so permanent and well settled as to have the force of law. In his analysis, he only cites to Dr. Phillips' report. *See* Doc. 217 at 28; Dr.

Phillips' Report, Doc. 217 at 269, Exhibit 32. Dr. Phillips' report does not opine on widespread practices at the facility, but only on how Wellpath staff failed to follow Wellpath's policies in the treatment of Plaintiff. *See* Doc. 217 at 28; Doc. 217 at 269, Exhibit 32. In each of these asserted deviations from policy, it appears that Dr. Phillips identified a Wellpath policy, and then explained how the Wellpath nurse or employee did not meet or follow this policy as to the treatment of Plaintiff. *Id.* No where in this report does Dr. Phillips identify a custom of not following Wellpath's policy or standards of care. Generally, mere unconstitutional treatment of an individual is not evidence of a practice or custom. *Praprotnik*, 485 U.S. at 128. Moreover, a failure to comply with policy does not amount to a constitutional violation on its own but requires proof that the entity acted with deliberate indifference. *George, on behalf of Bradshaw v. Beaver Cnty.,* 32 F.4th 1246, 1254 (10th Cir. 2022) (employees alleged failure to follow policies in five instances as to treatment of plaintiff did not show a pattern of constitutional violation).

Plaintiff asserts a widespread custom did exist. He states "[t]hrough additional discovery, it was revealed that the policy deviations cited by Dr. Phillips were not one-off, isolated deviations; they were based in widespread customs and practice by CCDC employees." Doc. 217 at 29. But Plaintiff does not cite to any such evidence or the record in his Response (Doc. 217). *Id.; see* Fed. R. Civ. P. 56(c)(3); (e). Similarly, Plaintiff asserts that "the Wellpath and CCDC employees charged with caring for Mr. Harrison during his detention did not act in accordance with the policies promulgated by CCDC; rather they followed widespread customs contrary to policy." Doc. 217 at 30-31. Plaintiff does not cite to any record or any asserted fact supporting that assertion. *Id.* Fed. R. Civ. P. 56(c)(3), (e). For example, Plaintiff does not cite to anything in the record suggesting that similarly situated individuals were mistreated by Curry

County in a similar way. He also does not cite to any evidence supporting his assertion that the deviations from Wellpath's policies were a widespread practice. *see* Plaintiff's Response, Doc. 217. Therefore, Plaintiff has not created a genuine dispute of material fact that there was a custom or deliberate indifference to a substantial risk of harm.

Plaintiff asserts that a pattern of unconstitutional behavior is not required to satisfy the deliberate indifference element "if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action." *Dubois v. Payne Cty. Bd of Cty. Comm'r*, 543 Fed. Appx 841, 849 (10th Cir. 2013) (unpublished). In support of that statement, however, Plaintiff did not cite to any evidence that Curry County or Wellpath were aware that Wellpath employees in this case were allegedly not following certain policies. *See* Doc. 217 at 31. Moreover, Plaintiff has not cited to any evidence showing that any Curry County official was aware of Plaintiff's condition. *See id.* at 848 (noting that there was no evidence to "support the conclusion that [jail officials] knew, or should have known, of [the deceased inmate's] condition").

Plaintiff asserts that it was "plainly obvious" that adopting a custom where correctional guards conducted observations of detainees along with medical staff would result in deliberate indifference to a substantial risk of harm. *See* Doc. 217 at 32. But as explained above in detail, the record does not reflect that correctional officers were expected to make specialized medical decisions beyond that of a layperson, especially when medical staff were also expected to observe Plaintiff hourly. *See* Deposition of Sgt. Dawson, Doc. 143-9, Exhibit I at 46:8-11. (placement on medical observation is a medical decision outside officer's expertise); Doc. 143-2, Deposition of Michelle Paquin, NP, Exhibit B at 26:17-24 (Wellpath's medical provider stated

that she expected medical staff to check on those in holding cells under medical observation hourly).

Plaintiff primarily cites to Joe Alaniz's deposition testimony, but as explained in his testimony and his affidavit, correctional officers conducted security checks and were not expected to have any specialized medical knowledge. Rather, the record reflects that Wellpath medical staff were expected to conduct medical checks on Plaintiff. Doc. 217 at 68, Deposition of Joe Alaniz Exhibit 6 at 132:4-6, 182:11-12; Affidavit of Joe Alaniz, Doc. 143-1, Exhibit A at 4-5. The observation log, which lists codes and descriptions officers were expected to write down, does not list any specific medical-related codes which officers were expected observe and record. *See* Doc. 143-9 at 3, Observation Log, Exhibit 3 to Exhibit I. Plaintiff has not cited to anything in the record that correctional officers should have greater medical knowledge than a layperson when medical staff were also expected to check on him.

Even if correctional officers conducted medical observations, Plaintiff has not shown that it was "plainly obvious" that having correctional officers conduct frequent checks in tandem with medical staff would be deliberately indifferent to a substantial risk of harm.[7] Plaintiff was seen, evaluated, treated, and released by a physician at Plains Regional Medical Center. When returned from the hospital, Plaintiff was evaluated by an employee of Wellpath, who had requested he be placed in medical observation, where he would be subject to security checks by Curry County officers, and medical checks by Wellpath staff.

The Court concludes that Plaintiff has not demonstrated that there was an unconstitutional custom, or that Curry County was deliberately indifferent to a substantial risk of harm resulting from that custom. *Barney*, 143 F.3d at 1307 ("The deliberate indifference

---

[7] Plaintiff asserts that Wellpath staff in Plaintiff's case did not conduct checks as frequently as they were expected to, but Plaintiff has not cited to anything that such failure was plainly obvious to Curry County.

standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."). Therefore, on this alternative ground Count II is dismissed.

**C.     Plaintiff has not argued that Curry County committed a *Monell* violation based on the combined actions of multiple employees acting under unconstitutional customs.**

Rarely, a municipality can be liable under *Monell* independent of whether an individual employee committed a constitutional violation, based on the combined unconstitutional actions of employees acting under a custom. "In the Tenth Circuit, while unusual, municipal liability may exist without individual liability: for example, for a systemic failure of medical policies and procedures." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023). Even where "the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020).

Here, Plaintiff has not argued that the combined acts or omissions of several employees acting under a custom violated his constitutional rights. Therefore, the Court declines to consider this form of *Monell* liability *sua sponte.  See, e.g., Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1275 n.20 (10th Cir. 2022) (declining to consider form of *Monell* liability that plaintiff had not presented this theory of liability to district court).

Alternatively, only to the extent the Court is required to consider this form of *Monell* liability *sua sponte*, the Court finds that Plaintiff has not established that multiple employees

acted under a *custom* which violated his constitutional rights, as explained above. He has not demonstrated a systemic failure of policies or procedures.

Plaintiff has not provided any evidence that any officer, much less multiple officers, were aware of the symptoms Plaintiff suffered and were deliberately indifferent to a substantial risk of harm. "Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." 768 F.2d at 308. *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020). Plaintiff does not argue that staffing, facilities, or equipment were inadequate. Plaintiff does not show that the deviations from policies in this case were a custom, *i.e.*, a widespread practice. To the extent there was a custom of having both correctional officers and medical staff check on detainees, Plaintiff has not demonstrated Curry County knew or should have known that this would result in a violation of Plaintiff's constitutional rights, or was otherwise deliberately indifferent to a substantial risk of harm.

III.   **Plaintiff has not shown that Curry County is liable under *Monell* for failure to train or supervise employees.**

Under Count III, Plaintiff asserts that Defendant Curry County failed to train its correctional officers on medical care and diagnosis, and such failure was deliberately indifferent to a substantial risk of harm. The Court disagrees and concludes Plaintiff has not demonstrated liability under *Monell* for failure to train or supervise.

For an entity to be held liable for a failure to train or supervise claim, there must be an underlying constitutional violation by an employee. *Est. of Burgaz by & through Zommer v. Bd. of Cnty. Commissioners for Jefferson Cnty. Colorado*, 30 F.4th 1181, 1189 (10th Cir. 2022) ("For a municipality (or sheriff, in this case) to be held liable for either a failure-to-train or

failure-to-supervise claim, an individual officer (or deputy) must have committed a constitutional violation."), *citing Crowson v. Washington Cnty., Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020) ("[A] failure-to-train claim may not be maintained [against a municipality] without a showing of a constitutional violation by the allegedly un-, under-, or improperly-trained officer."); *Id.* at 1191 (citing approvingly *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155–56 (10th Cir. 2001), which conditioned municipal liability for a failure-to-supervise claim on an individual officer's constitutional violation). As explained above, Plaintiff has not demonstrated that any Curry County employee violated his constitutional rights. On this basis alone, Plaintiff's failure to train or supervise claim may be denied.

Even assuming the Tenth Circuit were to reject the published decisions above, the Court finds that Plaintiff has not established a failure to train or supervise, causation, or deliberate indifference. Plaintiff must identify specific deficiencies in the training program closely related to the injury, and that delinquency must have caused the underlying deliberate indifference. *Keith v. Koerner*, 843 F.3d 833, 838-39 (10th Cir. 2016). To state a *Monell* claim based on the failure to train or supervise, a plaintiff must sufficiently allege that the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

Plaintiff has not cited to anything in the record or in case law suggesting that correctional officers should be trained to identify strokes where there is medical staff on site 24/7, who are

also conducting medical checks on a detainee in the holding cell. Even assuming Defendant should have conducted such training, Plaintiff has not cited to anything in the record to create a genuine dispute of material fact that the training they received does not meet any standard, or demonstrates a deliberate indifference to a substantial risk of harm to Plaintiff. Finally, Plaintiff has not shown that such failure to train arose from deliberate indifference to a substantial risk of harm.

Plaintiff also asserts that detainees are not adequately supervised, as the observation log may or may not have been accurately filled out. Doc. 217 at 33. Plaintiff has not created a genuine dispute of material fact that the log was inaccurate. *Id*. Even assuming the observation log were inaccurately filled out, Plaintiff has not cited to anything in the record that the failure to adequately fill out the observation log caused any injury.

Plaintiff also asserts that Defendant violated *Monell* by staffing the medical department with LPNs. He appears to argue that staffing with LPNs demonstrates a failure to supervise or train. Plaintiff summarily asserts that an LPN is not qualified to identify stroke symptoms. But Plaintiff did not cite to anything in the record demonstrating that LPNs are not adequately trained to identify stroke symptoms. *See* Doc. 217 at 33. Plaintiff has not cited to any authority that LPNs are insufficient to conduct a screening function, where they are expected to contact on-call medical providers. *see, e.g., Ernst v. Creek Cnty. Pub. Facilities Auth.*, 697 F. App'x 931, 934 (10th Cir. 2017) (plaintiff had provided no evidence or authority that LPN could not conduct mental health or suicide evaluation). As admitted by Plaintiff's expert, Wellpath's policies and procedures were consistent with the standard of care, and the staffing by the LPNs met Wellpath's policy. Deposition of Dr. Grant Christopher Phillips, MD, Doc. 217 at 93, Exhibit 12, 10:14-19.

Moreover, Plaintiff's argument appears to be contrary to the facts which were either expressly undisputed, or not genuinely disputed. Specifically, Plaintiff's expert stated he had no evidence that the detention center security staff were inadequately trained. Doc. 143 at 8, DSMF ¶ 31, citing Doc. 143, Exhibit J (Plaintiff's expert Will Adams agreeing that he does not have evidence of inadequate training).[8] Plaintiff also agreed that at all times the detention center was sufficiently staffed. Doc. 143 at 8, DSMF ¶ 32 (undisputed). As admitted by Plaintiff's expert, Wellpath's policies and procedures were consistent with the standard of care. Deposition of Dr. Grant Christopher Phillips, MD, Doc. 217 at 93, Exhibit 12, 10:14-19.

Moreover, Plaintiff has not demonstrated that any injury was caused by a failure to train or supervise. As noted above, Plaintiff did not cite to the record demonstrating that their training was insufficient to identify a stroke. *see* Doc. 217 at 33-34. Moreover, it appears that the nurse, a Wellpath employee, relied upon a misdiagnosis. Tenth Circuit "precedent is clear that "a misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim." *Self*, 439 F.3d at 1234, *quoted in Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020). Moreover, "prison officials generally may rely on the advice and course of treatment prescribed by medical personnel." *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1265 (10th Cir. 2022). Plaintiff does not demonstrate that relying upon that diagnosis or course of treatment prescribed by a doctor was so unreasonable that the LPN should not have relied upon it. *Self v. Crum*, 439 F.3d 1227, 1232, 1234 (10th Cir. 2006), *cited in Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (claim that a course of treatment was inadequate after the

---

[8] Plaintiff's sole dispute as to Defendant's asserted fact 31 is that Curry County's correctional staff were inadequately trained on identifying medical emergencies. This is not a genuine dispute, as Plaintiff does not present evidence that officer's training on identifying emergencies was inadequate. Fed. R. Civ. P. 56(c)(3), (e). Plaintiff cites to an Affidavit by his expert witness, Will Adams, but his expert witness's affidavit does not state or show that this training was inadequate in a correctional setting. *See* Affidavit of Will Adams, Doc. 217 at 83-85, Exhibit 9.

exercise of medical judgment, absent an extraordinary degree of neglect, also does not rise to disregard of serious medical need.").

Plaintiff has not cited to any authority or anything in the record that staffing with LPNs was insufficient under any standard or violated the constitution.  He has not cited to evidence that on-site staffing with an LPN, who were supposed to contact medical providers, effectively denied him access to adequate medical care. *see, e.g., Ernst v. Creek Cnty. Pub. Facilities Auth.*, 697 F. App'x 931, 934 (10th Cir. 2017) (plaintiff had provided no evidence or authority that LPN could not conduct mental health or suicide evaluation).

Moreover, Plaintiff has not demonstrated deliberate indifference, *i.e.*, that the Defendant had actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation. Plaintiff has also not identified a pattern of similar constitutional violations by allegedly untrained officers.

Therefore, Plaintiff has not demonstrated that Curry County failed to adequately supervise or train.

## IV. **Defendant's motion to exclude testimony from Plaintiff's expert Will Adams is irrelevant to the Court's decision in this opinion.**

Defendant Curry County moves to exclude expert testimony from Plaintiff's expert, Will Adams. *See* Doc. 144.  Defendant asserts in part that Mr. Adams is not qualified to offer medical or legal opinions. The Court need not rule on this motion at this time, as Mr. Adams' affidavit is irrelevant to the resolution of Defendant Curry County's motion for summary judgment on the federal claims.

Plaintiff does not cite to Mr. Adams' affidavit at all in his asserted material facts or in his analysis. *See* Doc. 217 at 11-21. The Court generally does not consider material in the record

which has not been cited by the parties. *See* Fed. R. Civ. P. 56(c)(3) ("*Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record."). Plaintiff cites to Mr. Adams' affidavit once in attempting to dispute one of Defendant's asserted facts, but does not pinpoint cite to the affidavit. *See* Response, Doc. 217 at 8.

Even assuming he had cited to the affidavit, Mr. Adams' affidavit is far narrower in scope than Mr. Adams' report (which was not in the summary judgment record). Mr. Adams affidavit was irrelevant to deciding this summary judgment motion and did not create a genuine dispute of material fact precluding summary judgment. Plaintiff cites to the affidavit to dispute Defendant's asserted fact that security staff observed Plaintiff every thirty minutes, while medical staff were to perform observations hourly. *See* Defendant Curry County's Motion for Summary Judgment, Doc. 143 at 7, ¶ 25; Plaintiff's Response, Doc. 217 at 8 (Plaintiff's asserted dispute of fact 25). He does not explain how the affidavit is relevant to dispute this asserted fact, and the affidavit does not appear to create a genuine dispute as to this asserted fact. As noted above, and admitted by both Plaintiff and Defendant, the medical provider expected medical staff to have checked on Plaintiff every hour, but they apparently did not do so. The failure to follow policy by individual employees, by itself, does not amount to a *Monell* violation. Plaintiff does not explain in his analysis or asserted facts how Will Adams's affidavit creates a genuine dispute of material fact precluding summary judgment.

Moreover, assuming the Court should disregard Rule 56(c)(3) and review Will Adams' affidavit, the affidavit speculates that had the same officer been observing Plaintiff the entire 18-hour period, that officer would likely have recognized the stroke earlier. This assertion is speculative and does not cite to any support.

**V.    Court denies Plaintiff's motion to amend responses.**

Plaintiff timely filed his response to the motion for summary judgment at issue in this opinion. After the deadline to respond had passed, Plaintiff filed a motion to amend or correct his responses, asserting that he could file improved responses. Plaintiff asserts he could re-craft his responses to be more efficient for the Court to review.

A district court has discretion in determining whether to grant or deny a motion for leave to amend a response to a motion. *Livingston v. Univ. of Kansas Hosp. Auth.*, 844 F. App'x 82, 84 (10th Cir. 2021).

Here, Plaintiff asserts the deadline to file his responses was approximately October 25, 2023, based on stipulated extensions of the deadline. Plaintiff filed his responses. Plaintiff then filed his motion to amend his responses on October 31, 2023. Plaintiff appears to admit that his motion to amend his responses was not filed within the response deadline. *See, e.g.,* D.N.M.LR-Civ. 7.4(a) (14-day deadline for responses to motions; procedure for filing stipulated extensions).

The Tenth Circuit has stated that where a party seeks to amend a response after the time to respond has expired, the Court should analyze the request under the good cause and excusable neglect standards under Rule 6(b). *Livingston v. Univ. of Kansas Hosp. Auth.*, 844 F. App'x 82, 84 (10th Cir. 2021).

"[T]he court may, for good cause, extend the time… on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). A finding of excusable neglect depends on four factors: "[1] the danger of prejudice to the [non-moving party], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*

*Ltd. P'ship*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (citation omitted). "The most important factor is the third; an inadequate explanation for delay may, by itself, be sufficient to reject a finding of excusable neglect." *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1253 (10th Cir. 2017); *See United States v. Torres*, 372 F.3d 1159, 1163 (10th Cir. 2004). Plaintiff has not argued the good cause or excusable neglect standard. Plaintiff's motion is therefore denied. Although the Court appreciates the attempt to save judicial resources, the motions have now been fully briefed, and it would be more unnecessary work for the parties to re-draft their responses and replies.

## VI.   Court declines to exercise supplemental jurisdiction over state law claims.

Because all claims over which the Court has original jurisdiction have been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3).

With the dismissal of the federal claims against Curry County, it is clear that the Court does not have original jurisdiction over any of the remaining claims. Plaintiff's federal claims, Counts I-III, were asserted against Defendants Curry County, Wellpath, and their John/Jane doe employees. The Court dismisses the federal claims against Curry County in this order, and the claims against Wellpath and the John/Jane Doe Wellpath employees were dismissed by stipulation. *See* Doc. 280. Plaintiff was denied leave to amend to identify and name the individual employees of Curry County, and therefore there are no pending federal claims against those individuals. *See, e.g., Bell v. City of Topeka, KS*, 279 F. App'x 689, 691 (10th Cir. 2008) (affirming decision where district court denied amendment to name and identify john doe defendant, and entered summary judgment in favor of sole named defendant, resulting in dismissal of action in its entirety). Alternatively, the federal claims against the Curry County

employees were dismissed in this order.  Therefore, there are no federal claims remaining in this case.

Moreover, it is undisputed that there is no diversity jurisdiction. No party has asserted that this Court has diversity jurisdiction over the claims in this case, and it appears that complete diversity does not exist. The relevant time for determining the existence of complete diversity is the filing of the complaint. *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1239 (10th Cir. 2015) ("It is clear the relevant time period for determining the existence of complete diversity is the time of the filing of the complaint."); *Grimes v. Molish*, 785 F. App'x 576, 579 (10th Cir. 2019) ("having dismissed Grimes's constitutional claims … and having also correctly determined that the second amended complaint failed to allege a valid basis for diversity jurisdiction, the district court acted well within its discretion in declining to exercise supplemental jurisdiction over Grimes's state law claims."). Plaintiff alleges he is a resident of Bernalillo County, New Mexico, which no party has disputed. *See* Complaint, Doc. 1 at ¶ 1; First Amended Complaint, Doc. 61 at 1. Curry County is local entity in New Mexico, and the state law claims remain against it. Presbyterian asserts it is a New Mexico Corporation.  *See* Doc. 75 at 22. Moreover, Radiology Associates of Albuquerque asserts it is a New Mexico Corporation. Doc. 72 at 33. Therefore, it is clear based on the pleadings that complete diversity does not exist, and the Court lacks diversity jurisdiction over these claims.

A district court "may decline to exercise supplemental jurisdiction over a" state claim "if … the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Although declining supplemental jurisdiction is discretionary, the Tenth Circuit has held that district courts should presume to decline jurisdiction over state claims when federal claims

no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d at 1156). That conclusion is consistent with the Supreme Court's statement that:

> [n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*United Mine Workers of Am. v. Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130 (footnote omitted).Here, the Court has dismissed all claims over which it has original jurisdiction. The Court finds it appropriate to decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3).

Alternatively, only to the extent the Court should consider the *Gibbs* factors here, the Court has weighed the *Gibbs* factors and concludes that declining to exercise supplemental jurisdiction over the state law claims is appropriate. "In deciding whether to exercise jurisdiction, the district court is to consider 'judicial economy, convenience, fairness, and comity.' " *Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1172 (10th Cir. 2009), *quoting in part Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). The Court finds that these factors weigh in favor of declining to exercise supplemental jurisdiction under § 1367(c)(3). The remaining claims are state law claims over which this Court does not have original jurisdiction. The Court should decline to exercise supplemental jurisdiction "as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130 (footnote omitted). Although discovery has been

completed and this case has proceeded to briefing on summary judgment, the Tenth Circuit has held that a district court does not abuse its discretion in declining supplemental jurisdiction even where a case has reached summary judgment. *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (noting that district court may, and should, dismiss supplemental claims at summary judgment stage after original jurisdiction claims are dismissed); *see also Koel v. Citizens Med. Ctr., Inc.*, No. 2:21-CV-2166-HLT, 2023 WL 6599136, at *2 (D. Kan. Oct. 10, 2023) (declining supplemental jurisdiction over state medical malpractice claims even after discovery completed).

Finally, the statute of limitations has been tolled and Plaintiff may refile the state law claims in state court. 28 U.S.C. § 1367(d) (the statute of limitations is tolled for the pendency of the federal case *and* 30 days after the dismissal without prejudice); *Artis v. D.C.*, 583 U.S. 71, 90, 138 S. Ct. 594, 607, 199 L. Ed. 2d 473 (2018) (state statute of limitations tolled during the pendency of federal suit *and* for a period of 30 days after federal suit dismissed).

## CONCLUSION

For the reasons stated above, the Court dismisses the federal constitutional claims (Counts I-III) against Defendants Curry County (and to the extent necessary, the federal claims against the John Doe Curry County correctional officers). Because all claims over which the Court has original jurisdiction have been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3).

The remaining motions in this case are denied without prejudice to refiling them in state court pursuant to 28 U.S.C. § 1367(d).

**IT IS THEREFORE ORDERED** that the Defendant Curry County's Motion for Summary Judgment **(Doc. 143)** is **GRANTED IN PART** for the reasons described in this

Memorandum Opinion and Order. The federal claims asserted against Curry County are dismissed. To the extent federal claims remain as to the individual correctional officers, those claims are dismissed as well.

      **IT IS FURTHER ORDERED** that Plaintiff's Motion to Amend Responses (Doc. 221) is **DENIED**.

      **IT IS FURTHER ORDERED** that the remaining state law claims are dismissed without prejudice to refiling in state court pursuant to 28 U.S.C. § 1367(d);

      **IT IS FINALLY ORDERED** that all remaining motions in this case are denied without prejudice to filing in state court.

                               /S/_____

                               KEA W. RIGGS
                               UNITED STATES DISTRICT JUDGE